| | |
|---|---|
| JIM MOUA and MAO YANG, | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) **MEMORANDUM and ORDER** |
| ALEXANDER COUNTY; | ) |
| ALEXANDER COUNTY DEPT. OF | ) |
| SOCIAL SERVICES; and | ) |
| KAREN HOYLE, DIRECTOR of the | ) |
| ALEXANDER COUNTY DEPT. OF | ) |
| SOCIAL SERVICES, in her | ) |
| individual and official capacities, | ) |
| Defendants. | ) |
| _____ | ) |

     **THIS MATTER** is before the Court on Defendants' Motions for Summary Judgment and all related memoranda and exhibits in support thereof and in opposition thereto.  (Documents ##5-7,13,16)  Because the subject matter of this lawsuit poses a federal question, 28 U.S.C. §1331, jurisdiction is proper.  This matter is now ripe for disposition by the Court.

## I.

     This litigation arises from a child protective services report and subsequent series of events between Plaintiffs Jim Moua ("Moua") and Mao Yang ("Yang"), husband and wife, and the Alexander County Department of Social Services ("DSS") during the summer of 2005.

     In their respective briefs, the parties include nearly identical factual background information.  Since it is appropriate to view the facts in the light most favorable to the non-moving party, for purposes of resolving the instant motion for summary judgment, the Court adopts nearly verbatim the **"STATEMENT OF FACTS"** set forth by the Plaintiffs:[1]

---

[1] To the extent any factual discrepancy exists, it will be noted.

Plaintiff's Jim Moua and Mao Yang are married and the parents of six children, (Dep. Of Mao Yang, pp. 10, 73). In May 2005, they were living with their extended family in rural Alexander County including four minor children under the age of six. About 15 family members lived in the home. (Yang Dep., pp. 10, 16 22-23.).

On the night of May 18, 2005, Moua and Yang argued about family finances. (Yang Dep., pp. 25-28; Dep. Of Jim Moua, pp. 29-30.). Moua's brother-in-law, Teng Yang, joined the argument, which became heated. (Yang Dep., pp. 26-29-31.). Moua Dep., p. 31.). Moua and his wife's family had argued for years about Moua's failure to pay a dowry and hold a traditional Hmong wedding celebration. (Yang Dep., pp 20-21).

Just before the argument, Moua had been standing outside on the porch of his house holding a .22-caliber rifle. (Yang Dep., pp. 31-32, 35-36; Moua Dep., pp. 32-33). He had intended to take the rifle out to the family chicken coop to stand guard against possums and skunks that occasionally would eat the family's young chickens. (Yang Dep.,pp.31-32; Moua Dep., pp. 32-34). When Yang called Moua in from the porch to talk about the family's financial situation, Moua placed the gun, which he claims was locked and unloaded, on the porch and left it there. (Yang Dep., p. 35; Moua Dep., pp. 32-35, 47).

When Moua walked in, Yang was holding the family's youngest child, who was less than a year old, in her arms. (Yang Dep., pp 29-30). Moua, Yang, and Yang's brothers then argued for awhile. (Yang Dep., p.29). After the argument became heated, Moua said he was going to end things; he said he was going to the store and he left the house, taking his three other children with him. (YangDep., p.37). Yang took her husband's comment to mean that he might hurt himself or even kill himself. (Yang Dep., p. 39). After her husband left, Moua's brother-in-law called the police (Yang Dep., p. 38).

Deputy Larry Ingle of the Alexander County Sheriff's Office soon arrived at the home and took a statement from Yang. Yang told Deputy Ingle that her husband had pointed a gun at her and threatened to kill her. Deputy Ingle made a written police report in which he wrote that Yang had said that "her husband pointed a gun at her and threatened to kill her" before her husband left. Deputy Ingle's report said that "Husband pointed gun at wife", and it listed two crimes[,][sic] assault by pointing a gun and communicating threats (Yang Dep., pp. 39-41, 48 and Ex. "A"; Compl., Paragraph 8).

Deputy Ingle and Yang then went to the Alexander County Courthouse, where Yang met with a magistrate to take out warrants against her husband. Deputy Ingle introduced Yang to Melissa Hatten, a social worker for the Alexander County Department of Social Services, who asked her a few questions about what had happened (Yang Dep., pp. 44-62-65).

Yang told the magistrate "that there was a gun" in the house, that she had gotten into an argument with her husband, and that she believed her husband "would hurt himself or someone". She told the magistrate either that her husband had pointed a gun at her or had a gun in his hand and he had threatened to kill her. Based on what Yang told the magistrate the magistrate issued two warrants for Moua's arrest: one for assault by pointing a gun at Yang, and the other for communicating threats to her. The latter warrant stated that Moua had told Yang, "I'll kill you" (Yang Dep., pp.44-48, 53, Ex. "B").

Yang sought the warrants on the advice of her brother and Social Worker Hatten. Yang told Social Worker Hatten the same story about what had happened with her husband that she told to the deputy sheriff and magistrate; this included the allegation that her husband threatened to kill her. This was the second time that Yang had taken out charges against Moua for assault involving a gun. In 1999, she alleged that her husband pointed a .357 pistol at her but that charge

was later dropped (Yang Dep., pp.54-56,6-65,101-102, and Ex."E"). However, at trial Officer

Ingle testified it was his understanding he (Moua) never pointed a gun and he never raised a gun

in a manner where he said he would shoot anyone. He merely possessed a hand gun (Trial

Transcript p.227). Officer Ingle upon further questions then stated that "I was told at the scene

that he never pointed a firearm, that he merely possessed a firearm." (Trial Transcript p. 227).

When Officer Ingle was asked what he did as a result of what he was told that evening, he

replied, "At that particular time with the information and everything that we had, we did not see

any reason to put on any type of an amber alert or anything like that because from the

information that we had gathered he had not used the weapon forcibly in any way. He just

possessed a weapon" (Trial Transcript pp. 217, 218).

   Yang acknowledges that, based on what she told the deputy sheriff and the magistrate,

there appeared to be a dangerous situation in her house (Yang Dep., p.54).

   After the warrants were issued the night of May 18, Yang went home.  During the time

Yang had been gone, Moua returned to the house.  Yang's brothers had told Moua that the police

had come to the home and that  Moua should not be there, so Moua took their children and drove

to a friend's house. When Yang returned to the house, her relatives told her that Moua had been

there and left.  Yang then called  Moua and went to see him at his friend's house. Moua

apologized to her and said he had been angry and emotional. The couple and their four children

then went to Cornelius and stayed the night with Yang's sister, (Yang Dep., pp.57-58, 66-68;

Moua Dep., pp. 52-54).

   The next day, May 19, Yang went back to Alexander County with her youngest daughter,

who had a doctor's appointment.  When she got home, Social Workers Hatten and John Peragine

were there. Peragine was on the phone with Moua (Yang Dep., pp. 69-76).

Peragine met with Yang. Yang told Peragine that, if her husband returned home, she would be afraid for the safety of herself and the children. Peragine, Hatten, and a DSS supervisor advised Yang to go to a domestic violence shelter. Yang did not want to go but Peragine and Hatten told her that if she did not then DSS would be forced to take her children into custody. Later Peragine took Yang and her children to the shelter (Yang Dep., pp. 83-84; Dep. Of John Peragine, pp. 14, 16, 18).

Social Worker Peragine also spoke on the telephone with Moua. During their conversation, Peragine told Moua that there was a warrant for his arrest and asked him where his gun was. According to Peragine, Moua admitted that he had a gun and that he was at his sister-in-law's home in Cornelius with three of his children. Moua was then taken into custody by Cornelius police, and later an Alexander County Sheriff's deputy picked him up and returned him to Alexander County (Moua Dep., pp. 55-59; Peragine Dep., pp. 13-16).

On May 20, 2005, Yang signed a DSS safety assessment that said, "Dad had a gun and took it out and threatened mom". The assessment also said in reference to Yang and Moua: "Mom is fearful of Dad's threats".  Yang also told social workers that she thought her husband was spending time with friends who used crystal methamphetamine but that she did not think her husband was using illegal drugs. That day, Yang and her children went to the domestic violence shelter and stayed there two or three days (Yang Dep., pp. 85-88, 110).  Yang testified at her first hearing on May 25, 2005, "DSS told me that if I do not go to this shelter with my kids to make sure that me and my kids are safe from my husband, they would take custody of my kids" (5/25/05 Trial Transcript p. 50). She further stated she did not remember signing a paper (per DSS) (p. 50).

When Yang decided to leave the shelter, Social Worker Peragine told her that she could not return home or to the homes of family members because it would not be safe. When she insisted on returning home, Peragine and police officers took custody of her children pursuant to custody orders issued by the Alexander County District Court on May 22, 2005 (Yang Dep., p. 89-94; Peragine Dep.,pp. 30-34; Aff. Of Karen Hoyle, Ex. "A").

Yang testified at [the] hearing on May 25, 2005 that she called John (Peragine) and told him she wanted to go home and "my kids have been complaining they wanted to go home. So I told John that we were gonna go home. And if my Aunt (inaudible), we gonna stay with my aunt. And John told me that, if my aunt let[]s me, that's OK" (Non Secure Custody Transcript pp. 55,56). She further testified that "he (John Peragine) told me that if I'm just gonna go live at my aunt's house, which my husband already knew where that place is, it's not safe. And if I'm (Yang) willing to relocate, they will help me with whatever I needed to get relocated. And I told him that if I ever wanted to relocate, I would go up in Minnesota where I've got relatives up there. And which they (DSS) wanted, they said if I wanted to relocate, they would help  today, that's what they said. And I said, no, it's fine. I'm going to stay at my aunt's house and see if; what else happens and if I wanted to go to Minnesota, I would ask my family to help me." (Non Secure Custody Transcript p.57 )

The primary motivation for DSS in deciding to ask the Court for custody of the children and remove them from the home was the domestic violence incident of May 18 in which Moua had possessed a gun and threatened his wife. DSS wanted to ensure the children were in a safe environment. It is always a last resort for DSS to file a petition with the court to obtain custody of children (Peragine Dep., p.74; Dep. Of Karen Hoyle, pp. 18-19, 25-28, 30, 33, 36-37).

In taking its actions, DSS also considered that it was a relative of the plaintiffs who had called 911 and asked for police to come to the home and that Yang's family informed DSS about constant comments[2] between Yang and Moua (Hoyle Dep., pp. 27-28, 34-35).

DSS placed the children in foster care and Yang did not see them until at least a week later when she had supervised visitation with them (Yang Dep., pp. 95-96).

While the children were in DSS custody, social workers noticed dark purple-blue marks on the children that looked like bruises, and one of the children reported that his uncle and father had been hurting him. On May 23, 2005, social workers took three of the children to the hospital to be examined. A doctor at Frye Regional Medical Center's emergency room in Alexander County examined the children and said it appeared that they had bruises on their wrists, ankles, buttocks, pelvises, and backs. The doctor wrote in the medical records that the children might be victims of "child abuse" (Yang Dep., pp. 116-20, and Ex. "F", Peragine Dep., pp. 35-36).

The marks which are called Mongolian spots, are birthmarks and run in Yang's family. Yang was not present for the medical examinations of her children, so she could not inform the doctor that the spots were not bruises. Yang concedes, however, that the marks look like bruises to anyone not familiar with Mongolian spots (Yang Dep., pp. 116-20, 123-124).

On May 25, 2005, three of the children were taken to the Gingerbread House, a child advocacy center in Morganton, for further examination to determine whether the spots were bruises. DSS took the children there because the doctor who had examined them said they might be victims of abuse. At the Gingerbread House John Peragine stated that a nurse examined the children and determined that she could not be sure if the marks were bruises or Mongolian spots

_____

[2] Defendants' brief describes constant arguments between Yang and Moua as opposed to comments.

until another examination was conducted a week later. After the second examination was conducted at the Gingerbread House on June 1, a doctor determined that the marks were Mongolian spots, not bruises (Peragine Dep., pp. 35-40; Hoyle Dep., pp. 20-22). Not only did [the physicians conduct an] examination of the children's bod[ies], but [the doctors] also examined the children's sexual organs for possible sexual abuse[3] (Peragine Dep., p. 54).

Once it was confirmed that the marks were not bruises, DSS made no allegations that Yang and Moua had physically abused their children (Yang Dep., pp. 126-127).

The Alexander County District Court's first hearing to determine temporary custody of the children of Ms. Yang and Mr. Moua was conducted on May 25, the same day the children were first taken to the Gingerbread House. At that hearing Social Worker Peragine testified that medical professionals had not ruled out whether the marks were Mongolian Spots or bruises and they would not know for sure until the second examination a week later. Following the hearing the court found that a threat existed to the safety of the children, and it declined to return the children to the custody of Ms. Yang and Mr. Moua (Yang Dep., pp. 113-15, 125; Hoyle Dep., pp. 46-47; Peragine Dep., pp. 40-43).

While at the Gingerbread House John Peragine and Lisa Johnson, an officer with the Taylorsville Police Department, who in her initial assessment before the meeting decided that the spots on the children were not bruises but Mongolian Spots (Trial Transcript 189-214), met with representatives of the Gingerbread House on May 25, 2005, and as a result of that meeting closed her case (Trial Transcript pp. 189-214).

---

[3] This portion of the physical examination consisted of an external examination of the children's "sexual parts" rather than any internal examination. (Peragine Dep., pp. 46, 66-67; Yang Dep., pp. 125-27, 129-31.)

The children remained in foster care until mid-June, 2005, when they were returned to Yang and Moua, with the provision that the family live in Yang's aunt's house, which was next door. Thus, after the events of May 18, the children were away from Yang and Moua for about three or four weeks. Once the children and the parents started living with Yang's aunt, DSS social workers visited the family once or twice a week. DSS retained legal custody of the children pursuant to orders issued in June by the Alexander County District Court (Yang Dep., pp. 95-97; Hoyle Aff., Exs. "B" and "C").

On August 1, 2005, the Alexander County District Attorney's Office dismissed the charges that Yang had taken out against Moua. The dismissal form stated that Yang was "completely uncooperative" (Yang Dep., pp. 99-100 and Ex. "D").

In September and October 2005, the Alexander County District Court held hearings to determine whether Yang and Moua should have permanent custody of their children. After a final hearing concluded on October 6, 2005, the court returned sole custody of the children to Yang and Moua (Yang Dep., pp. 127-29; Compl., Section 22).

After the custody hearings concluded, DSS had no further involvement with Yang, Moua and their children. Prior to the events of May 18, 2005, DSS had no involvement with Yang, Moua and their children, and its involvement with the family stemmed solely from the events of that night (Moua Dep., pp. 72-73).

The Alexander County District Court signed its custody order February 2, 2006, and on February 7, 2006, DSS appealed to the North Carolina Court of Appeals, which affirmed the trial Court (Compl. Section 22, 26), *See* In re Matter of H.M. *et. al.*, 182 N.C. App. 308, 641 S. E. 2d 715(2007). Defendant Hoyle, the DSS director, made the decision to appeal (Hoyle Dep., p. 9). (Document #13-1 / Pls.' Mem. In Opp'n at 1-8).

On February 3, 2009, Plaintiffs initiated this civil action in the State of North Carolina, Alexander County Superior Court, alleging violations of their civil rights under 42 U.S.C. §1983, namely, the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and a claim under Article I, Section 19, of the North Carolina Constitution, against Defendants. (Document #1 / Compl. ¶¶3, 24, 34, 37)  Plaintiffs seek to recover monetary damages for being subject to a child protective services investigation that resulted in the issuance of non-secure custody orders, physical removal of their children from May 22, 2005 through the middle of June 2005, and temporary legal custody of the children being placed with Alexander County DSS from May 25, 2005 through October 2005.

Defendants filed a Notice of Removal on February 27, 2007, and petitioned this federal district court to find removal proper under 28 U.S.C. § 1441 as original jurisdiction could be had pursuant to 28 U.S.C. § 1331.  (Document #1 / Notice of Removal at 2).

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  A genuine issue exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248.   In conducting its analysis, the Court views the evidence in the light most favorable to the non-moving party.  Celotex Corp., 477 U.S. at 325.

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses ...." Celotex Corp., 477 U.S. at 323-324 (Rule 56 does

not require that the moving party support its motion with affidavits negating the opponent's claims); *See also* <u>Cray Comm'ns, Inc. v. Novatel Computer Syss., Inc.</u>, 33 F.3d 390, 393-395 (4th Cir. 1994).

## III.

As an initial matter, Plaintiffs' claims against Alexander County DSS are dismissed given that, pursuant to North Carolina law, the Department of Social Services, an agency of Alexander County, does not have the legal capacity to be sued.  *See* <u>Johnson v. Marrow</u>, 44 S.E.2d 468, 470 (N.C. 1947) (a county must be sued for the acts of its agencies); <u>Malloy v. Durham County Dep't of Social Servs.</u>, 293 S.E.2d 285, 289 (N.C. App. 1982) (local DSS has no capacity to sue or be sued); <u>Parker v. Bladen County</u>, 583 F.Supp.2d 736, 740 (E.D.N.C. 2008) (sheriff's department did not have legal capacity to be sued); <u>Efird v. Riley</u>, 342 F.Supp.2d  413, 419-20 (M.D.N.C. 2004)(dismissing claims against county sheriff's department); <u>Moore v. City of Asheville</u>, 290 F.Supp.2d 664, 673 (W.D.N.C.2003)(dismissing claims against city police department).

Likewise, the official capacity claim against Defendant Karen Hoyle, as Director of DSS, is merged with Plaintiffs' claim against Alexander County.  *See* <u>Stevenson v. Martin County Bd. of Educ.</u>, 3 Fed. Appx. 25, *3 (4th Cir.2001) (official capacity claim against a governmental official is treated as a suit against the government entity of which the official is an agent) (*citing* <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985)).

Consequently, Plaintiffs' remaining causes of action, discussed *seriatim*, pertain only to Defendant Hoyle in her individual capacity and Defendant Alexander County.

**IV.**

**A.  42 U.S.C. § 1983 / Absolute & Qualified Immunity**

Qualified immunity from § 1983 claims "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " <u>Pearson v. Callahan</u>, --- U.S. ----, 129 S.Ct. 808, 815 (2009) (*quoting* <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). It is intended to "balance[ ] two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Id.</u>

Claims to qualified immunity present a two-pronged inquiry. The governmental official will be granted immunity unless (1) "the facts that a plaintiff has ...shown (see Rules 50, 56) make out a violation of a constitutional right," <u>Pearson</u>, 129 S.Ct. at 815-16, and (2) "the right at issue was 'clearly established' at the time of [the] alleged misconduct," <u>id.</u> at 816. However, it is within our discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." <u>Pearson</u>, 129 S.Ct. at 818; *see* <u>Hunsberger v. Wood</u>, 570 F.3d 546, 552 (4th Cir.2009).

***

The Due Process Clause of the Fourteenth Amendment bars States from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Clause "guarantees more than fair process." <u>Troxel v. Granville</u>, 530 U.S. 57, 65 (2000) (plurality opinion) (*internal quotation marks omitted*). It "also includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." <u>Id.</u> (*internal quotation marks omitted*); *see* <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 840 (1998) (The Due Process Clause "cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." (*internal quotation marks omitted*)); <u>Love v. Pepersack</u>, 47 F.3d 120, 122 (4th Cir.1995) ("Substantive due process is a far narrower concept than procedural; it is an absolute check on certain governmental actions notwithstanding the fairness of the procedures used to implement them." (*internal quotation marks omitted*)).

<u>Doe v. South Carolina Dep't of Social Servs.</u>, 597 F.3d 163, 169 (4th Cir.2010) (considering

qualified immunity and Section 1983 substantive due process claim in the context of an

unsuccessful foster care placement).

In this case, Plaintiffs generally identify the alleged constitutional violation as a substantive right, namely, Plaintiffs' "constitutional right to family privacy and to be free from unreasonable and excessive actions in their relationship as parents to their children ...."[4] (Mem. In Opp'n at 9). Plaintiffs further contend that Defendants' "said actions are not outweighed by legitimate and great interest as guaranteed by the 4th, 5th, and 14th Amendments to the U.S. Constitution in violation of 42 U.S.C. § 1983." Id.

In order to properly analyze Plaintiffs' claims, a brief overview of the nature of the right asserted is warranted. The Fourth Circuit has summarized the jurisprudence in this area as follows:

> [T]he sanctity of the family unit is a fundamental precept firmly ensconced in the Constitution and shielded by the Due Process Clause of the Fourteenth Amendment. The concept of familial privacy has been restricted by the Supreme Court to (1) thwarting governmental attempts to interfere with particularly intimate family decisions, and (2) voiding government actions that sever, alter, or otherwise affect the parent / child relationship.
>
> ***
>
> The maxim of familial privacy is neither absolute nor unqualified, and may be outweighed by a legitimate governmental interest. The right to family integrity clearly does not include a constitutional right to be free from child abuse investigations.

Hodge v. Jones, 31 F.3d 157, 163 (4th Cir. 1994) (*internal citations and quotation marks omitted*) (addressing Section 1983 action in context of parental demand for expungement of DSS child

---

[4] Plaintiffs' Complaint describes the alleged constitutional violation more specifically as "deprivation of their constitutional rights in the excessive and unreasonable actions of said agency in said agency's prosecution and attempts to take the minor children of the Plaintiff's[sic] from them as set forth hereinafter." (Compl. ¶1)

protective services records where no abuse or neglect is substantiated); *see also* Renn v. Garrison, 100 F.3d 344, 349 (4th Cir.1996) (reversing and remanding for judgment holding that individual social workers did not exceed child protection statutes and were entitled to qualified immunity as a matter of law).

In addition to the familiar doctrine of qualified immunity, absolute prosecutorial immunity has been applied to preclude liability for certain protective services duties. *See e.g.*, Preston v. McDowell County, 2006 WL 3434928 (W.D.N.C. 2006) (Thornburg, J.) (judicial-type acts of social workers, such as the filing of petitions for custody are subject to absolute or prosecutorial immunity) (*quoting* Vosburg v. Dep't of Social Servs., 884 F.2d 133, 145 (4th Cir.1989) (applying Virginia protective services statute). As the Fourth Circuit explained in Vosburg,

> the filing of a removal petition is, in essence, the start of judicial proceedings against the parent or guardian of a minor cihld, and the duties of the social worker at that point are those of an advocate in that process....Like a prosecutor, a social worker must exercise her best judgment and discretion in deciding when to file a Removal Petition. The welfare of the state's children would be jeopardized if social workers had to weigh their decision in terms of their potential personal liability. In short, the denial of absolute immunity here has the potential to adversely affect the efficient functioning of the state's child welfare system. Additionally, the chances are high that suits against the social workers would occur with some degree of regularity. Parents, resentful of and humiliated by an attempt to usurp their rights, would likely channel their frustration into the ascription of improper and malicious actions to the State's advocate.

Vosburg, 884 F.3d at 137 (*internal quotation marks omitted*). The Fourth Circuit emphasized, however, that absolute immunity only extends to the *prosecutorial* acts of social workers, not the acts in furtherance of their investigations. Vosburg, 884 F.3d at 138.

**B.  First Cause of Action Alleging Section 1983 Violation Against Defendant Karen Hoyle, Individually**

Qualified immunity is dispositive of Plaintiffs' claim against Defendant Hoyle,

individually.  Hoyle, as Director of DSS for Alexander County and executive for the agency, had

overall supervisory responsibility for the social workers assigned to work on this matter (*i.e.*,

Melissa Hatten and John Peragine).  Nonetheless, Hoyle is not the immediate or direct supervisor

of either Ms. Hatten or Mr. Peragine and it is undisputed that Hoyle did <u>not</u> weigh in on the

decision to petition for non-secure custody of the children.   Hoyle's personal involvement

relevant to this matter is limited to her decision, on behalf of the agency, to seek direct appeal of

the district court's order returning sole legal custody of the children to Plaintiffs.  As for the

election to appeal the final custody ruling, judicial review of the district court's decision is

provided for by statute, N.C. GEN. STAT. §§1-277(a) and 7A-27(c). Plaintiffs present no authority

to support the position that exercising a right to appeal constitutes a violation of a clearly

established constitutional right. Moreover, decision-making with reference to the filing of a

direct appeal (*i.e.*, an appeal seeking judicial review) is considered a prosecutorial-type function

and, therefore, is also protected from suit on prosecutorial immunity grounds.  *See*  <u>Warney v.</u>

<u>Monroe County</u>, 587 F.3d 113, 122 (2nd Cir. 2009) ("[A]bsolute immunity extends to actions

taken while working on direct appeals."); <u>Kolle v. Grigg</u>, 2007 WL 4322276, *6 (D.S.C. 2007)

(prosecutorial immunity extends to appeals).  As a result, this claim does not survive summary

judgment.

**C.  Third Cause of Action Alleging Section 1983 Violation Against Defendant Alexander County**

Plaintiffs' Section 1983 claim against Alexander County for alleged disproportionate,

exaggerated, and objectively unreasonable conduct in connection with the protective services case also fails as a matter of law.[5]   Collectively, qualified and absolute (or prosecutorial) immunity govern the judicial-type acts undertaken by Alexander County as well as its investigative efforts.  Generally speaking, the conduct of Alexander County, through its social workers, was consistent with the express mission of North Carolina's Child Protective Services, namely, "to help the parents ... and the court to prevent abuse or neglect, to improve the quality of child care, to be more adequate parents ..., and to preserve and stabilize family life."  Renn, 100 F.3d at 350 (*quoting* N.C.Gen.Stat. § 7A-542, since repealed and replaced by § 7B-300). Similarly, the record reveals that Alexander County did not depart from its statutory authority under N.C.Gen.Stat. § 7B-300, *et seq.*[6]  Renn, 100 F.3d at 350 (detailing statutory response to a report of abuse, neglect, or dependency under previous version of statute, N.C.Gen.Stat. § 7A-544).

In responding on the night of May 18, 2005, the social workers reasonably relied and acted on the information received from law enforcement and members of the family, including

---

[5] Paragraph 29 of Plaintiffs' Complaint alleges:

Upon information and belief, the abuse to which the Plaintiff's[sic] were subjected to, was consistent with a custom, policy, pattern and practice of said agency and County to apply and/ or the use of excessive and unreasonable actions to win cases against individuals.  The county and agency were deliberately indifferent to repeated violations of constitutional rights of said individuals, including Plaintiff's[sic].

[6] Presently, North Carolina law provides in pertinent part:

when a report of abuse, neglect or dependency is received, the director of the department of social services shall make a prompt and thorough investigation in order to ascertain the facts of the case, the extent of the abuse or neglect, and the risk of harm to the juvenile, in order to determine whether protective services should be provided or the complaint filed as a petition.

N.C.Gen.Stat. § 7B-302 (1999).

Yang. Despite Plaintiffs' retrospective assertions, the record evidence makes clear that the authorities were told that Plaintiff Yang was fearful of her husband's threats and was concerned that he might harm himself or others.[7]  In addition to Plaintiff Yang's personal assessment, and her reports to law enforcement and Melissa Hatten, authorities soon discovered that there had been a prior alleged domestic violence incident reported by Yang in Alexander County.[8] Also in the record is the report that Yang and Moua were constantly arguing with each other and Plaintiff Yang's comment about her husband associating with people who were involved with or using methamphetamine. Out of concern for the safety of the children, social workers encouraged and facilitated a temporary placement for Yang and the children away from Moua and began providing protective services. *See* N.C.GEN.STAT. § 7B-302 (a) and (c).  As Yang conceded during her deposition, based upon the information provided by the family at the outset of the investigation to Deputy Ingle, the agency, and the magistrate, ***an objectively reasonable social worker had cause to be concerned for the safety of the children***.  Before the investigation could be completed, and against the professional advice of social workers, Yang made a decision to leave the temporary placement.  At that point, social workers had to reevaluate their role and response according to their statutorily-prescribed duties.  *See* N.C.GEN.STAT. § 7B-302 (c) and (d)[9]; Vosburg, 84 F.2d at 137 ("The social worker must make a quick decision based on perhaps

---

[7] The services of Alexander County DSS were requested and, in fact, welcomed by the extended family.

[8] Like the assault and communicating threat charges Yang filed on May 18, 2005 against her husband, the earlier case was eventually dropped by Yang.

[9] Subsection 7B-302(c) states that if the parent "refuses to accept the protective services provided or arranged by the director, the director shall sign a petition seeking to invoke jurisdiction of the court for the protection of the juvenile or juveniles."

Subsection 7B-302(d) generally provides for the immediate removal of the juvenile from the

incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children."); <u>Renn</u>, 100 F.3d at 350 (noting it was appropriate for social worker to credit initial report of abuse until a more thorough investigation could be made).  Thus, the Court finds, as a matter of law, that qualified immunity shields Alexander County from liability as a result of the protective services provided to Plaintiffs' family.

Further, the actual filing of petitions seeking non-secure custody of Plaintiffs' children constitutes a judical act of Alexander County DSS given that the filing of the petition triggers judicial intervention and process. *See generally*, <u>Vosburg</u>, 84 F.2d at 137.   Accordingly, as in <u>Preston</u>, where the defendant social workers and McDowell County enjoyed absolute prosecutorial immunity for filing the petitions for non-secure custody because they were "engaged in activities intimately associated with the judicial process, acting in roles that were the functional equivalent of state prosecutors...," Alexander County likewise enjoys the same protection.  <u>Preston</u>, 2006 WL 3434928, *6.

Similarly, during the pendency of the protective services investigation, other red flags were raised that naturally led social workers to probe further and request physical examinations of the children.  In addition to observing what was later determined to be Mongolian spots or birthmarks (which Yang concedes present like ordinary bruises), one of the children reported to social workers that his uncle and father had been hurting him.  After a follow-up examination was recommended and accomplished (for purposes of observing any change in appearance of the

---

home for the child's protection, the procedure whereby that remedy is sought by invoking the jurisdiction of the court, as well as the ability of the protective services worker to assume temporary custody for that purpose where warranted.

spots or bruised areas), the Mongolian spot diagnosis was promptly reported to the court. Throughout, hearings were held regularly to update the court and parental visitation was arranged and accomplished.  As factual questions were resolved concerning potential abuse and neglect, Alexander County acted accordingly and did not pursue any abuse or neglect complaint against Plaintiffs.  Full legal custody was ultimately restored to Plaintiffs.  Section 1983 liability is unavailable to Plaintiffs on this record.

Finally, the Court finds that Plaintiffs have abandoned any claim challenging Alexander County's  (or Defendant Hoyle's)  level of supervision, hiring, or retention of DSS employees. To the extent this claim is not abandoned, it has no support in the record.[10]  Defendant Hoyle testified that the policy of DSS in court hearings is that social workers should tell the truth. (Hoyle Dep. 14-15).  Further, the DSS' "custom, policy, and practice in carrying out its duties is to observe the constitutional and statutory rights of every person."  (Hoyle Aff. ¶3)  Plaintiffs provide <u>no</u> <u>evidence</u> to the contrary.  Plaintiffs cannot rest on unsupported allegations and survive summary judgment.  *See* Fed. R. Civ. P. 56(e).

### C.  Statute Of Limitations

Alternatively, Plaintiffs' Section 1983 claims may be barred by the statute of limitations. The parties agree that a three-year statute of limitations governs Plaintiffs' claims arising under Section 1983.[11]  However, the parties advance different positions concerning accrual of the three-year limitations period.  As the Fourth Circuit explained in <u>Brooks v. City of Winston-</u>

---

[10] Plaintiffs specifically identify Social Worker John Peragine as an agent Alexander County failed to train properly.  (Compl. ¶37) Without producing *any* evidence in support, Plaintiffs simply conclude that Peragine was one of the DSS agents permitted to misrepresent facts in cases.

[11]  The same statute of limitations applies to Plaintiffs' state law constitutional claim.

<u>Salem</u>, "[a]lthough the applicable state statute of limitations supplies the length of the limitations period in a §1983 action, the time of accrual of the cause of action is a matter of federal law." <u>Brooks v. City of Winston-Salem</u>, 85 F.3d 178, 181 (4th Cir.1996) (*citation omitted*). Pursuant to federal law, accrual of the statute of limitations is triggered when the plaintiff possesses "sufficient facts about the harm done [] that reasonable inquiry will reveal his cause of action." <u>Nasim v. Warden, Md., House of Corr.</u>, 64 F.3d 951, 955 (4th Cir.1995).

In this case, accrual of the limitations period occurred prior to February 3, 2006 given that the Plaintiffs temporarily lost physical custody of their children on May 22, 2005. No reasonable inquiry was necessary. Alexander County DSS had removed physical custody from the parents and the parents were dependent upon the Department of Social Services in terms of their ability to visit their children. To the extent this was not the case, the follow-up hearings and October 2005 ruling returning sole legal custody to the Plaintiffs – all of which took place prior to February 3, 2006 – provided Plaintiffs with additional facts that would conceivably have triggered the accrual of the statute of limitations. Plaintiffs' contention that the three-year statute of limitations does not begin to accrue until "after the last act of the Defendant's[sic]" is not persuasive.[12] Because Plaintiffs commenced this civil action on February 3, 200<u>9</u>, all conduct

---

[12] Counsel cites an alienation of affections case, <u>McCutchen v. McCutchen</u>, 624 S.E.2d 620, 623-24 (N.C. 2006), to support Plaintiffs' position regarding what the law *should* be. (Pls.' Mem. In Opp'n at 12) ("Plaintiff's[sic] contend this should be the law of this case."). In <u>McCutchen</u>, the North Carolina Supreme Court considered the accrual of the statute of limitations in the context of an alienation of affections claim and held that accrual occurs when the wrong is complete. <u>McCutchen</u>, 624 S.E.2d at 623. In that context, the court explained that alienation of affections (or "the wrong") entails determining when "the destruction, or serious diminution of the love and affection of the plaintiff's spouse" occurs, recognizing that "[t]he diminution or destruction often does not happen all at once ...." <u>Id.</u> The court opined further that determining when the wrong was complete, namely, when alienation occurs, is ordinarily a question for the fact finder. <u>Id.</u> at 624. Plaintiffs argue that because North Carolina's public policy favors the protection of marriage, and because federal policy favors the protection of the familial rights of citizens, the rule announced in <u>McCutchen</u> *should* be the applicable rule of law here. (<u>Id.</u>) The Court is not persuaded.

occurring prior to February 3, 2006 is barred.

**D.  North Carolina Constitution / Defendant Alexander County**

Plaintiffs' claim pursuant to the North Carolina Constitution fails as well since Plaintiffs are unable to establish a federal constitutional violation and the constitutional claims (state and federal) are analyzed the same way. *See e.g.*, Tri-County Paving, Inc. v. Ashe County, 281 F. 3d 430, 436 n. 6 (4th Cir.2002) ("synonymous" interpretation for state and federal provisions); Munn-Goins v. Bd. of Trs. of Bladen Cmty. College, 658 F.Supp.2d 713, 731 (E.D.N.C. September 17, 2009) (same).

## V.

For the reasons stated herein, Defendants' Motion for Summary Judgment is hereby **GRANTED**.  Plaintiffs' claims are dismissed with prejudice.

Signed: January 26, 2012

Richard L. Voorhees
United States District Judge